# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  2:21-MJ-02632 |
| SAFETY DEPOSIT BOX 49 AND ITS CONTENTS, previously taken from U.S. Private Vaults, and now in storage at the FBI | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See caption above*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1956, and 21 U.S.C. §§ 841, 846 | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Zera J. Poirier

*Applicant's  signature*

Postal Inspector Zera J. Poirier

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____

*Judge's  signature*

City and state: <u>Los Angeles, CA</u>

Hon. Charles F. Eick, U.S. Magistrate Judge

*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

**ATTACHMENT B**

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1343 (wire fraud) and 1956 (money laundering) and 21 U.S.C. §§ 841 and 846 (drug trafficking), (the "Target Offenses") namely:

a.    Evidence of wealth, such as cash over $5,000, financial instruments, cryptocurrencies, and documents and records referring or relating to the same; and

b.    Records or items containing indicia of ownership or control of a safety deposit box or its contents such as rental agreements or references to specific persons or their contact information.

**AFFIDAVIT**

I, Zera J. Poirier, being duly sworn, hereby depose and state as follows:

I. **TRAINING AND EXPERIENCE**

1.    I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"), located in the Central District of California, Los Angeles Division, and have been so employed since August 2018. Prior to becoming a Postal Inspector, I worked for the Federal Judicial Courts Northern District of Texas, Amarillo Division, as a Federal Probation Officer for approximately two and a half years.  Before my employment with Federal Probation, I was a police officer in the Denver Metro Area in Colorado for approximately three years. My training and experience includes the investigation of numerous major criminal cases including, but not limited to, crimes related to the attack and misuse of the United States mail system, including theft of mail, access device fraud, identity theft, assaults, robberies and burglaries.

2.    I have completed a 14-week federal law enforcement training course which included instructions in criminal investigations of mail theft, mail fraud, identity theft, internet investigations, and prohibited mailings (such as

narcotics).  I have attended training in the proper
identification, preservation, and collection of digital devices
and storage media. I have also attended training in the proper
identification, preservation, and analysis of social media
records. I am currently assigned full-time as a Postal Inspector
with the Mail Theft and External Crimes Team.   As a Postal
Inspector assigned to that team, I am responsible for the
investigation of the unlawful use of the U.S. Mail for criminal
activity, including stolen U.S. Mail, identify theft, bank,
check and credit card fraud.

II. **SUMMARY AND PURPOSE OF AFFIDAVIT: SEARCH AND GPS WARRANTS**

3.   This affidavit is made in support of an application
for a warrant to search Safety Deposit Box Number 49
(hereinafter "BOX 49"), used by BRENDA SIMS and LEON SALTER (the
"TARGET SUBJECTS"), and which was previously seized from U.S.
Private Vaults, Inc., for violations of 21 U.S.C. §§ 841 and 846
(drug trafficking), and 18 U.S.C. §§ 1343 (wire fraud), 1956
(money laundering) (the "Target Offenses").  BOX 49 is currently
held in the custody of the FBI in Los Angeles, CA.

4.   This affidavit is made in support of an application
for a warrant authorizing the disclosure of cell-site and GPS
information, as well as the use of a cell-site simulator, also
known as a "Stingray," as defined or discussed within the
application, at such intervals and times as the government may

request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, which disclosure will establish the approximate location of the following cellular telephones for a period of 45 days:

5.   323-427-8529, a cellular telephone issued by T-Mobile and used by LEON SALTER ("SALTER"), (hereinafter "SUBJECT TELEPHONE").

6.   I also seek authorization under 18 U.S.C. § 3103a(b), for reasonable cause shown below, to delay notification of the proposed GPS/Stingray order for a period of 30 days from the date that the disclosure ends.

7.   As described more fully below, I respectfully submit there is probable cause to believe that cell-site information, GPS information, and information from a cell-site simulator, likely to be received concerning the approximate location of the SUBJECT TELEPHONE will constitute or yield evidence of the location of LEON SALTER and his conspirators who are the subject of an investigation the Target Offenses.

<u>Summary</u>

8.   During the execution of a federal seizure warrant for the nests of safety deposit boxes of an indicted safety deposit box company, federal agents inventoried a box which did not have any contact information, BOX 49, which contained $150,900 in US

- 3 -

currency.  The cash was isolated and presented to a drug K9 who
alerted to the odors of an illegal drug.  Leon SALTER later made
a claim for BOX 49 and said it belongs to his sister Brenda SIMS
and he has access to the box.  An employee of USPV identified
SALTER by photograph and stated that he accessed a safety
deposit box at USPV.  A review of SALTER's history indicates he
has multiple arrest and convictions, many related to fraud and
identity theft.

III. **PROBABLE CAUSE STATMENT**

9.    From speaking with the case agents from USPIS the
Federal Bureau of Investigation ("FBI") and Drug Enforcement
Administration ("DEA") and reading their reports, I know that
U.S. Private Vaults is a business in a strip mall that rents
safety deposit boxes anonymously. It is owned and managed by
criminals who engage in money laundering, drug trafficking, and
structuring, among other offenses. Its business model is
designed to appeal to criminals for customers. It charges many
times what banks do for similar safety deposit box rentals, but
staff conduct countersurveillance for customers, alert them to
law enforcement investigations, and structure transactions for
them to avoid filing currency reports--in addition to providing
them a place to store criminal proceeds anonymously. USPV also
launders for its customers cash that is purported to be drug
proceeds by converting it into precious metals or wire

- 4 -

transfers. The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it uses to pay its operating expenses. By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering.

10.  I know from reading the indictment that on March 9, 2021, USPV was indicted by a federal grand jury for conspiring with its customers and others to launder money, distribute drugs, and structure financial transactions to avoid currency reporting requirements.  A copy of that indictment is attached and incorporated.

11.  Beginning on March 22 through March 26, 2021, I, along with agents from USPIS, FBI and DEA executed federal search and seizure warrants at USPV which authorized, among other things, seizing the nests of safety deposit boxes at USPV as evidence and instrumentalities of the offenses committed by USPV.  The warrants did not authorize criminal searches of the contents of the individual boxes but specified that agents would conduct an inventory of the contents in accordance with their written procedures, and were authorized to look for contact information in those individual boxes in order to notify the boxholders of the seizure so that they could seek the return of their property. An inventory search was conducted on all the boxes at

USPV, including BOX 49.

IV. **Drug Detecting K9 Alerted to the Cash in BOX 49**

12.  On May 17, 2021, I read a declaration from Chino
Police Department K9 Officer Angel Bran who handles a drug
detecting K9, "Cyra." From his declaration and speaking with
officer Bran as well as another Chino Police K9 handler, Officer
Rowland, I learned that, Cyra has received over 240 hours of
basic training.  Cyra receives weekly training as part of her
certification requirements.  As part of her certification
process, Cyra is subjected to a blind, controlled test in which
different types of illegal drugs are hidden in different places
in a large training facility.  Her handler does not know where
the drugs are.  If Cyra alerts to an area that does not contain
drugs, or fails to locate any of the drugs, she would fail and
not be certified.

13.  On March 23, 2021, while the search warrant for USPV
was being executed, federal agents presented the cash from BOX
49 to Cyra.  Officer Bran said in his declaration that "Cyra
alerted to the presence of the odor of illegal drugs emitting
from BOX 49."

A. SALTER and SIMS Assert they Rented BOX 49

14.  On or about March 22, 2021, while the search warrant
on USPV was being executed, a person later identified as LEON

SALTER approached law enforcement officers guarding the
perimeter of the search operation.  I later learned that SALTER
provided officers his name, identification card, contact
information including the SUBJECT TELEPHONE, and made a claim
for BOX 49.

15.  On April 9, 2021, law enforcement interviewed an
employee of US PRIVATE VAULTS (USPV).  During the interview, the
employee identified a photograph of SALTER as someone who rented
a safety deposit box with his sister. However, the employee only
really saw LEON SALTER at the vault. Inspector Versoza then
showed a photo of SIMS, but the USPV employee was unable to
recognize her.  In my training and experience, criminals will
often put their own assets in the names of persons they trust,
such as family members, who do not have a criminal history

16.  On April 13, 2021, I called SIMS at the number SALTER
had earlier provided for her and spoke with a person who
identified herself as SIMS.  I asked her for her box number and
she stated it was BOX 49.  I asked her if she was the owner of
the box and she stated she was but her brother, SALTER, has
access to BOX 49 as well.  She stated she had not made a claim
but her brother had walked up to USPV while the search warrant
was being conducted and gave agents their information.  She did
not provide her address but confirmed her brother's address as
1028 W 124th St, Los Angeles, California 90044. I asked SIMS

- 7 -

what was located in BOX 49 and she stated "mattress money" that her family had been saving to open a business.

17.   On May 17, 2021, I contacted SALTER at THE SUBJECT TELEPHONE, which he had previously given when making a claim for Box 49.  SALTER verified THE SUBJECT TELEPHONE was the best number to contact him at and he verified his address as 1028 W 124th St, Los Angeles, CA 90044.  He stated SIMS is the main person on BOX 49 but he has access to it.  He stated only he and SIMS have access to BOX 49.

B. <u>SALTER's Criminal History</u>

18.   On May 13, 2021, I reviewed SALTER's criminal records and case files and learned that SALTER has been convicted of numerous federal and state crimes.  His California state felony arrests and convictions include: arson, multiple counts of burglary, petty theft, receive known stolen property, display fake ID card, forgery, multiple counts of grand theft, possess bad check/money order, make/pass fictitious check, failure to appear, false checks, use access account information without consent, evade police officer, conspiracy to commit crime, use identification with intent to defraud.  SALTER was also convicted out of the Central District of California for Possession of Stolen Mail in 1999 and 2015.  He was sentenced to 21 months imprisonment and 3 years of supervised release on the

first sentence and 36 months' probation on the second.  His most recent conviction is a 2019 California state felony conviction for Using Identification with intent to Defraud for which he received a prison sentence of 16 months in prison and 6 months' probation.  In my training and experience, identity theft offenses such as the one Salter was convicted of in 2019, and the use of stolen mail (in which checks in the mail are commonly altered and then negotiated) generally result in financial transactions which, in turn, generate wires in interstate commerce.

19.  SIMS does not have a criminal history.

20.  I also reviewed records from the California Franchise Tax Board.  From this review, I learned that in searching their records since 2014, the FTB found that SALTER has not filed state income tax since at least 2014, and SIMS has filed state taxes from 2015 through 2019 showing income as follows: $27,838 in 2015, $31,969 in 2016, $34,049 in 2017, and $68,481 in 2018. Thus it does not appear that SALTER and SIMS have legitimate, declared income that would permit them to save the $150,000 in cash found in BOX 49.

C. SIMS' SUSPICIOUS FINANCIAL ACTIVITY

21.  On May 18, 2021, I reviewed banking and financial records related to SIMS. From my review, I learned the following:

- 9 -

a. SIMS was part of what appears to be a money laundering scheme between May 19, 2015, and July 5, 2015, when funds were added to her Paypal account balance using multiple Paypal "My Cash" cards, and then immediately withdrawn to another prepaid credit card or to a bank.  Paypal my cash cards are a secure way to add cash to a Paypal account and can be purchased at numerous retail outlets.  Based on my training and experience, I know that fraudsters often use stolen debit and credit cards to buy prepaid cards, such as Paypal My Cash cards, and then transfer the funds from those prepaid cards to other accounts to make it hard to trace the illicit funds to their ultimate destination.

D. TECHNICAL BACKGROUND REGARDING CELL-SITE SIMULATORS

22.  Based on my training and experience and my conversations with other agents and investigators, I understand the following regarding cell-site simulators:

23.  Cell-site simulators, commonly referred to as a "Stingray," function by transmitting as a cell tower.  In response to the signals emitted by the simulator, cellular devices in the proximity of the device identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.

24.  A cell-site simulator receives and uses an industry

- 10 -

standard unique identifying number (e.g., Electronic Serial
Number (ESN), Mobile Equipment Identifier (MEID), International
Mobile Subscriber Identity (IMSI), International Mobile
Equipment Identity (IMEI), Mobile Station Identity (MSID),
Mobile Directory Number (MDN) or the Universal Fleet Member
Identity (UFMI)) that is assigned by a device manufacturer or
cellular network provider.  When used to locate a known cellular
device, a cell-site simulator initially receives the unique
identifying number from multiple devices in the vicinity of the
simulator.  Once the cell-site simulator identifies the specific
cellular device for which it is looking, it will obtain the
signaling information relating only to that particular phone.

    25.  By transmitting as a cell tower, cell-site simulators
acquire the unique identifying information from cellular
devices.  This identifying information is limited, however.
Cell-site simulators provide only the relative signal strength
and general direction of a subject cellular telephone; they do
not function as a GPS locator, as they do not obtain or download
any location information from the device or its applications.
Moreover, cell-site simulators do not collect the contents of
any communication.  This includes any data contained on the
phone itself:  the simulator does not remotely capture emails,
texts, contact lists, images, or any other data from the phone.
In addition, cell-site simulators do not provide subscriber

account information (for example, an account holder's name, address, or telephone number).

E. INTENDED USE OF THE CELL-SITE SIMULATOR AND DELETION OF NON-TARGET DATA

26.  Investigators intend to use the cell-site simulator to send signals to the **SUBJECT TELEPHONE** that will cause the **SUBJECT TELEPHONE**, and non-target cellular phones on the same provider network in close physical proximity, to emit unique identifying information, which the cell-site simulator will collect.  Investigators will then use the information collected by the cell-site simulator to determine the physical location of the **SUBJECT TELEPHONE**. Investigators plan to use the cell-site simulator to determine unique identifiers at multiple locations and/or multiple times at the same location.

27.  Although the cell-site simulator will collect the unique identifiers not only of the **SUBJECT TELEPHONE**, but also identifiers belonging to nearby non-target cellular telephones, these latter identifiers will not be used by law enforcement for investigative purposes, just as the extraneous incoming and outgoing telephone numbers necessarily recorded by conventional pen registers and trap-and-trace devices are not used for affirmative investigative purposes.  Absent further order of the court, law enforcement will make no investigative use of

information concerning non-targeted cellular devices other than distinguishing the **SUBJECT TELEPHONE** from all other devices. Once law enforcement has located the **SUBJECT TELEPHONE**, it will delete all information not associated with the **SUBJECT TELEPHONE.**

28.   The cell-site simulator may interrupt cellular service of cellular devices within its immediate vicinity.  Any service disruption will be brief and temporary, and all operations will attempt to limit the interference with cellular devices.

### GROUNDS FOR SEALING AND DELAYING NOTICE

29.   Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to seal this application and warrant, as well as the return to the warrant.  I also believe that reasonable cause exists to delay the service of the warrant as normally required for a period of 30 days beyond the end of the disclosure period pursuant to 18 U.S.C. § 3103a(b) and, pursuant to 18 U.S.C. § 2705(b), to enter an order commanding the Carrier not to notify any person, including the subscriber of the **SUBJECT TELEPHONE**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court

upon application for an extension by the United States.  There is reason to believe that such notification will result in (1) flight from prosecution; (2) destruction of evidence, or (2) otherwise seriously jeopardizing the investigation.

30.  Furthermore, there is good cause for the warrant to be issued such that the information may be provided to law enforcement at any time of the day or night because in my training and experience, and knowledge of this investigation, the TARGET SUBJECTS do not confine their activities to daylight hours, and it is often even more difficult to conduct surveillance at night.

**CONCLUSION**

31.  For all of the above reasons, there is probable cause to believe that prospective cell-site information, GPS information, as well as information from a cell-site simulator, likely to be received concerning the approximate location of the **SUBJECT TELEPHONE**, currently within, or being monitored or investigated within, the Central District of California, will constitute or yield evidence of the location of TARGET SUBJECTS and aid in the investigation of the TARGET SUBJECTS.

32.  Also for the reasons stated above, there is also probable cause to believe that evidence and proceeds of the Target Offenses, as described more particularly in Attachment B, are in BOX 49.

- 14 -

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this _____ day of May, 2021.


_____
UNITED STATES MAGISTRATE JUDGE

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>           v.<br><br>U.S. PRIVATE VAULTS, INC.,<br>   California Corporate<br>   Number C3405297,<br><br>           Defendant. | CR 2:21-cr-00106-MCS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy<br>to Launder Money; 21 U.S.C. § 846:<br>Conspiracy to Distribute<br>Controlled Substances; 18 U.S.C.<br>371: Conspiracy to Structure<br>Transactions; 18 U.S.C.<br>§ 982(a)(1), 21 U.S.C. §§ 853 and<br>881(a)(6), 28 U.S.C. § 2461(c) and<br>31 U.S.C. § 5317(c): Criminal<br>Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

b.   Co-conspirator USPV Officer was an officer of USPV and

one of its owners.  USPV Officer dealt in marijuana, in violation of the laws of California, as well as cocaine.

     c.   Co-conspirator USPV Manager was the manager of USPV. USPV Manager helped USPV Officer arrange drug deals within USPV, and helped USPV customers avoid detection by law enforcement, including by advising them to structure their cash purchases to avoid reporting requirements.

     d.   Co-conspirator Gold Business was a dealer in precious metals and jewelry, and shared the same space as USPV, as well as some employees.  Gold Business helped USPV customers convert their cash into gold, and structured their cash transactions to avoid federal reporting requirements.

     e.   Co-conspirator USPV Representative One was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative One instructed USPV customers how to structure transactions to avoid federal reporting requirements.

     f.   Co-conspirator USPV Representative Two was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative Two instructed USPV customers how to structure transactions to avoid federal reporting requirements.

B.   THE OBJECTS OF THE CONSPIRACY

     2.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant USPV conspired with others known and unknown to the Grand Jury to launder money, in violation of Title 18, United States Code, Section 1956, namely:

     a.   to knowingly conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity,

that is, the distribution of controlled substances, with the intent
to promote the carrying on of that specified unlawful activity, in
violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b.   to knowingly conduct and attempt to conduct financial
transactions involving the proceeds of specified unlawful activity,
that is, the distribution of controlled substances, knowing that the
transactions were designed in whole or in part to conceal and
disguise the nature, location, source, ownership, and control of the
proceeds of specified unlawful activity, in violation of Title 18,
United States Code, Section 1956(a)(1)(B)(i); and

c.   to knowingly conduct and attempt to conduct financial
transactions involving the proceeds of specified unlawful activity,
that is, the distribution of controlled substances, knowing that the
transactions were designed in whole or in part to avoid a transaction
reporting requirement under Federal law, in violation of Title 18,
United States Code, Section 1956(a)(1)(B)(ii).

C.   MANNER AND MEANS OF THE CONSPIRACY

3.   The objects of the conspiracy were carried out and were to
be carried out, in substance, as follows:

a.   Defendant USPV would adopt business practices that
attracted customers in possession of proceeds from criminal offenses,
including drug trafficking, and not law-abiding persons.  Such
practices included: (1) touting the anonymity of the safety deposit
rentals that defendant USPV would provide, including by advertising
"we don't even want to know your name"; (2) boasting that, unlike
banks, its anonymous safety deposit box rentals did not require
customer information that "can be easily accessed by government
agencies (such as the IRS)"; (3) making arrangements for the payment

3

of the rental fees in cash and other ways that would be untraceable; (4) issuing safety deposit box keys that were unmarked and unnumbered so that law enforcement could not determine that the keys unlocked safety deposit boxes at USPV; and (5) charging safety deposit box rental rates several times higher than those at banks.

b.   USPV Officer would capitalize defendant USPV with the proceeds of his illegal drug trafficking.

c.   USPV Officer would invite other drug traffickers who knew and trusted him because of his illegal drug trafficking to store the proceeds of their drug trafficking at defendant USPV.

d.   Employees of defendant USPV would conduct counter surveillance of the neighborhood and warn customers when they observed law enforcement.

e.   Agents of defendant USPV would instruct customers to structure transactions to avoid currency transaction reports including by purchasing gold and other precious metals through Gold Business, which would structure transactions and not file required currency reports.

f.   If agents of defendant USPV learned that law enforcement was interested in searching or seizing the contents of a particular customer's safety deposit box, they would attempt to warn the customer, delay law enforcement, or even remove all but a nominal amount of cash from the box for the customer, to prevent law enforcement from discovering and seizing the bulk of the cash.

g.   Defendant USPV would deposit the cash proceeds it received from its customers for safety deposit box rentals, which included proceeds from the distribution of controlled substances, into its bank account, and then use those proceeds to maintain USPV's

4

anonymous storage facilities for its criminal customers.

        h.   USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

        i.   USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

COUNT TWO

[21 U.S.C. § 846]

4.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

1   defendant USPV could provide in bulk.

2      <u>Overt Act No. 2</u>:  On July 26, 2019, USPV Officer met

3   Confidential Informant 3 within USPV to sell him 1,000 vape

4   cartridges containing THC.  USPV Officer delivered the cartridges in

5   the parking lot of USPV, and received in exchange $8,000 in cash

6   within USPV's business location.

7      <u>Overt Act No. 3</u>:  On or about December 11, 2019, during

8   discussions for the sale of cocaine, USPV Officer instructed the

9   buyer, Confidential Informant 3, to use a wireless communication

10  application called "Signal," which is encrypted to communicate with

11  him regarding the transaction.

12     <u>Overt Act No. 4</u>:  On or about December 16, 2019, USPV Officer

13  instructed Confidential Informant 3 to come to USPV to complete the

14  exchange.

15     <u>Overt Act No. 5</u>:  On or about December 16, 2019, USPV Manager

16  called Confidential Informant 3 and explained that co-conspirator

17  USPV Officer was not being careful enough, and could bring unwanted

18  law enforcement attention to defendant USPV by conducting this drug

19  deal onsite.

20     <u>Overt Act No. 6</u>:  On or about December 18, 2019, USPV Officer

21  sold an ounce of cocaine to Confidential Informant 3 through

22  intermediaries.

COUNT THREE

[18 U.S.C. § 371]

8.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

9.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.    MANNER AND MEANS OF THE CONSPIRACY

10.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

11.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

Overt Act No. 1:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

$10,000: "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6: On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually. USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions. USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7: On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8: On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9: On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

     a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

     b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

     a.   The business computers;

     b.   The money counters;

     c.   The nests of safety deposit boxes and keys;

     d.   The digital and video surveillance and security equipment; and

     e.   The biometric scanners.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2. Defendant USPV shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property, real or personal:

i. constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii. used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b. A sum of money equal to the total value of the property described in subparagraph a above.

///

13

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

a.    The business computers;

b.    The money counters;

c.    The nests of safety deposit boxes and keys;

d.    The digital and video surveillance and security equipment; and

e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),
defendant USPV shall forfeit substitute property, up to the value of
the property described in paragraph 2 above if, as the result of any
act or omission of defendant USPV, the property described in
paragraph 2 above or any portion thereof (a) cannot be located upon
the exercise of due diligence; (b) has been transferred, sold to, or
deposited with a third party; (c) has been placed beyond the
jurisdiction of the court; (d) has been substantially diminished in
value; or (e) has been commingled with other property that cannot be
divided without difficulty.

A TRUE BILL

/S/

Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section

16

**AFFIDAVIT**

**HANDLER ANGEL BRAN AND K9 "CYRA"**

I, **Officer Angel Bran,** attended the Adlerhorst Police Dog Handler Course in June 2019 with Police Service Dog (PSD) Cyra. I received 240 hours of instruction in basic police dog handling skills. PSD Cyra and I were certified as a patrol team in August 2019. In August 2020, PSD Cyra and I attended the Adlerhorst Police Dog School Drug Detection Class. During this course, PSD Cyra and I receive 240 hours of instruction in the detection of the odor of illegal drugs. In September 2020, PSD Cyra and I passed a certification test in the detection of the odor of illegal drugs. During this course, I personally observed PSD Cyra alert to the presence of the odor of an illegal drug. I am familiar and knowledgeable in the behavior's PSD Cyra engages in when she detects the odor of illegal drugs.

I have been a Peace Officer since 2013 and have been present at hundreds of drug investigations since the start of my career. I have received formal training from the San Bernardino County Sheriff's Department, Chino Police Department and the California Narcotic Officers' Association on drug recognition and symptomology.

I do continual training with PSD Cyra through Adlerhorst International and out in the field during patrol or training sites hosted by different police departments. The training includes various hiding locations including, but not limited to: vehicles, buildings, bags, parcels and open areas. This training also includes proofing PSD Cyra on novel odors such as: plastic, boxes, latex, tape, metal, money (circulated and un-circulated) and food. I also proof PSD Cyra off my human odor. This training is on-going and continual.

On _3-23-2021 @ 1542_, _POSTAL INSPECTOR VERSALA_ asked that I and my drug detection PSD Cyra to assist in a drug investigation. PSD Cyra alerted to the presence of the odor of illegal drugs emitting from the following:

Box Number: _49_

**K9 Officer Angel Bran #3655**
**Chino Police Department**